# EXHIBIT S

```
 1              BEFORE ARBITRATOR CALVIN SHARPE
          IN THE MATTER OF THE ARBITRATION BETWEEN:
 2

 3

 4   THE TENNESSEE TITANS and)
     THE NATIONAL FOOTBALL    )
 5   LEAGUE MANAGEMENT        )
     COUNCIL,                 )
 6                            )
              Grievants,      )
 7                            )
         vs.                  )
 8                            )
     BRUCE MATTHEWS and THE   )
 9   NATIONAL FOOTBALL LEAGUE )
     PLAYERS ASSOCIATION,     )
10                            )
              Respondents.    )
11   _____)

12

13

14           TRANSCRIPT OF PROCEEDINGS
15           BEFORE CALVIN WILLIAM SHARPE, ARBITRATOR
16           FRIDAY, OCTOBER 9, 2009
17           9:30 A.M.
18

19

20

21

22

23

24

25
```

```
 1    BEFORE CALVIN WILLIAM SHARPE, ARBITRATOR
 2    APPEARANCES:
 3         FOR THE GRIEVANTS:
 4              DANIEL L. NASH, ESQ.
                Akin Gump Strauss Hauer & Feld LLP
 5              1333 New Hampshire Avenue, N.W.
                Washington, DC  20036-1564
 6              (202)887-4000
                dnash@akingump.com
 7
                - and -
 8
                MARLA S. AXELROD, ESQ.
 9              Akin Gump Strauss Hauer & Feld LLP
                Two Commerce Square
10              2001 Market Street
                Suite 4100
11              Philadelphia, Pennsylvania
                19103-7013
12              (215)965-1200
                maxelrod@akingump.com
13
                - and -
14
                BROOK F. GARDINER, ESQ.
15              National Football League
                Labor Relations Counsel
16              Management Council
                280 Park Avenue
17              New York, New York  10017
                (212)450-2421
18              brook.gardiner@nfl.com
19
           FOR THE RESPONDENTS:
20
                RICHARD BERTHELSEN, ESQ.
21              NFL Players Association
                1133 20th Street NW
22              Washington, D.C.  20036
                (202)756-9126
23              richard.berthelsen@nflplayers.com
24
25
```

3

```
1                      I N D E X
2
3    EXHIBITS                              PAGE
     (All exhibits retained by Counsel)
4
     1   Collective Bargaining Agreement   1
5
     2   Grievance                         9
6
     3   Answer                            9
7
     4   Supplemental Answer               9
8
     5   Appeal Letter and Player Profile  10
9
     6   Letter Appealing Grievance to     10
10       Arbitration
11   7   2002-2007 Contract                11
12   8   2001-2007 Contract                11
13   9   1999-2003 Contract                11
14   10  1995-1999 Contract                12
15   11  Workers' Compensation Claim       14
16   12  Letter - 8/5/08 to Matthews from  15
         Titans
17
     13  Media Guide Excerpt               15
18
     14  Petition for Dismissal            17
19
     15  Player's Brief (California case)  18
20
     16  Player's Deposition Transcript    19
21
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2              THE ARBITRATOR:  Let me say good
 3   morning to you all once again and welcome to
 4   this arbitration in the matter of the Tennessee
 5   Titans and Bruce Matthews.
 6              Before we go on the record, just let
 7   me say -- let me ask a few preliminary
 8   questions, the first being whether there is a
 9   dispute in this matter which is arbitrability.
10              MR. NASH:  We don't believe there is.
11   We think there may be a dispute over what issues
12   are involved in this grievance and what issues
13   are not.
14              From our perspective, this grievance
15   involves a very straightforward question of
16   whether Mr. Matthews breached the clear terms of
17   his player contract with the Titans.  Our
18   understanding is that the -- that Mr. Matthews
19   is asserting a defense to that breach, based on
20   law in California, which we don't believe has
21   any application to this proceeding.
22              So I think there's no question that
23   you have the jurisdiction to arbitrate the
24   question of whether Mr. Matthews is in breach of
25   his specific NFL player contract.  We would
```

1    probably have a dispute -- and I think this is

2    going to be one of those cases, and you'll hear

3    from us a little bit more about it today -- in

4    which we'll have to argue in the post-hearing

5    briefs about the, mostly I think, legal

6    questions, not very many, if any, factual

7    questions.

8              And so there will be arguments, I

9    suppose, in the post-hearing briefs about what

10   role California law, in particular, should have

11   here.  But I think there's no question that the

12   dispute, from our perspective, is arbitrable.

13             MR. BERTHELSEN:  For the most part, I

14   would agree.  I also agree with Mr. Nash that

15   there will be reliance by us on law outside the

16   shop, for lack of a better term, not just

17   California law, but federal law and also law in

18   the state of Tennessee.

19             But we're going to argue to you that

20   Mr. Matthews is not in breach of his contract,

21   primarily, and if you were to accept the

22   interpretation of the contract that Mr. Nash

23   will urge to you, then we are going to argue to

24   you that law in Tennessee, California, and

25   federal law still allows Mr. Matthews to proceed

1   as he is with a Workers' Comp claim in

2   California.

3           THE ARBITRATOR:  Okay.  So I gather

4   you intend to brief this matter?

5           MR. NASH:  Intend to brief the

6   matter, yes, absolutely.

7           THE ARBITRATOR:  Okay.  And will

8   there be any witnesses in this proceeding?

9           MR. BERTHELSEN:  We don't currently

10  plan on any witnesses, unless one of us says

11  something that changes our mind with.  I doubt

12  that we will.

13          MR. NASH:  I believe that's correct.

14  I think that we ought to be able to -- I think

15  mostly what we need to accomplish today is make

16  sure that we put into the record the contract

17  and the documents that we think are at issue

18  here.  I don't think there are many, and I don't

19  think there's really much dispute about the

20  facts.

21          I think the dispute really goes to

22  the argument about how to interpret the contract

23  and whether Mr. Matthews is in breach.  And so

24  my guess -- and I think we've talked a little

25  bit about this -- is that this should probably

1    be a relatively short proceeding today.  We just

2    want to make sure that we get the documents

3    before you and make sure that we answer any

4    questions that you might have, and then I think

5    we'll have a briefing schedule.

6             Because you'll hear some arguments,

7    probably, today about the law.  And I think

8    without having the benefit of the cases and the

9    like, there's going to be no way for you to

10   certainly resolve those issues today.  We're

11   going to need to brief on that, from both sides.

12            THE ARBITRATOR:  Okay.  And in light

13   of the absence of witnesses, and probably a very

14   short transcript, do you want to set a briefing

15   date at this point?

16            MR. BERTHELSEN:  Typically, we do it

17   at the end of the hearing.  In the CBA, we have

18   a prescribed schedule for briefing, which is --

19   I have to look again, but it's a certain number

20   of days after receipt of the transcript, so we

21   would just notify you when we got the transcript

22   and, through an exchange of letters, agree that

23   the deadline is what it is.

24            THE ARBITRATOR:  Okay.  Fair enough.

25   Does it matter who goes first here?

1              MR. NASH:  Well, I assume we should

2       go first because it's our grievance.  So I think

3       that's the way we will do it.

4              Should we -- before we go forward,

5       should we try to agree on the documents?

6              MR. BERTHELSEN:  Yes.

7              MR. NASH:  Might make it a little bit

8       easier to do that.  And so what I would

9       propose -- and Richard, you fill it out however

10      you think makes sense -- I think we normally

11      start with the Collective Bargaining Agreement

12      as Joint Exhibit 1 one.

13             THE ARBITRATOR:  Exhibit 1.

14             (Marked Exhibit 1.)

15             MR. NASH:  And then, I believe the

16      Grievance would be -- it might be helpful if we

17      just give copies of these to you right now.

18             THE ARBITRATOR:  Thank you.

19             MR. NASH:  And we would make this --

20      do we want the reporter to mark these things?

21             MR. BERTHELSEN:  Go ahead and mark

22      them.  I trust you.

23             THE ARBITRATOR:  You mark them.

24             MR. NASH:  So this will be Joint

25      Exhibit 2.  Is that okay?

1          MR. BERTHELSEN:  Sure.

2               (Marked Exhibit 2.)

3          MR. NASH:  Joint Exhibit 2 will be

4     the Grievance itself.  So this would be the

5     Grievance.  And then the Answer will be Joint

6     Exhibit 3.

7               (Marked Exhibit 3.)

8          MR. NASH:  And then I think you have

9     a Supplemental Answer --

10          MR. BERTHELSEN:  Yeah.

11          MR. NASH:  -- that we should mark as

12    Joint Exhibit 4.

13          DEPOSITION OFFICER:  Do you want

14    stickers?

15          MR. NASH:  It's up to the arbitrator.

16          THE ARBITRATOR:  Doesn't matter.

17    Just as long as I can determine what it is.

18               (Marked Exhibit 4.)

19          MR. NASH:  Yeah.  And this is a

20    Supplemental Answer.  And then I think that we

21    have -- the player's contract.

22          MS. AXELROD:  Hold on.  Before we do

23    that, do we want to do the appeal letter, player

24    profile?

25          MR. NASH:  Yeah, I suppose the appeal

1    letter and player profile is normally put in as

2    exhibits.

3              MS. AXELROD:  This would be Joint 5.

4              MR. NASH:  So this would be the

5    player profile.

6              (Marked Exhibit 5.)

7              MR. BERTHELSEN:  That's 5?

8              MR. NASH:  Yeah, that's 5.

9              And then Joint Exhibit 6 would be the

10   letter appealing the grievance to arbitration.

11             (Marked Exhibit 6.)

12             MR. BERTHELSEN:  Do you have an extra

13   copy of the profile?

14             MR. NASH:  Yeah, I think we do.

15   Sure.

16             MR. BERTHELSEN:  Thanks.

17             MR. NASH:  And then I think we should

18   put in the contracts; right?

19             MS. AXELROD:  Yeah, those are coming.

20             MR. NASH:  I think we'll start with

21   the most recent one.  We were on 6.  We'll make

22   the most recent one Joint Exhibit 7.

23             Do you -- Richard, do you want some

24   copies of these, or do you have them?

25             MR. BERTHELSEN:  The most recent

```
1    contract?
2                MR. NASH:  Yeah, the one that says
3    2001 through 2007, I think.  That would be 7.
4                (Marked Exhibit 7.)
5                MS. AXELROD:  There are two recent
6    ones, okay.  That one is different.
7                MR. NASH:  Oh.
8                MS. AXELROD:  2001 through 2007, the
9    first one was 2002 through 2007.
10               MR. NASH:  So this is Joint
11   Exhibit 8, the one before.  We're just going to
12   go backwards, I guess.
13               (Marked Exhibit 8.)
14               MR. NASH:  And then we'll make this
15   Joint Exhibit 9 would be the -- let me tell
16   Richard which one this is.
17               MS. AXELROD:  1999 through 2003.
18               MR. NASH: So Joint Exhibit 9, this
19   is the contract before that.
20               (Marked Exhibit 9.)
21               MS. AXELROD:  1995 to 1999 is 10.
22               MR. NASH: And I think that's what we
23   need.  That's sufficient because it goes back to
24   the Houston contract.
25               Okay, so this would be 10.  This
```

1    would be Joint Exhibit 10.

2              (Marked Exhibit 10.)

3              MR. BERTHELSEN: All right.  So are we

4    at 7, or did we go on to 8?

5              MR. NASH:  No, we're at 10.

6              MR. BERTHELSEN:  Sorry, let me catch

7    up here.

8              MR. NASH:  Let me catch you up.

9              So you had -- we want to go back to

10   the Oilers contract, to the Houston contract.

11   So 7 was the one that was from 2001 to 2007.

12             MS. AXELROD:  No, 7 is 2002 to 2007.

13             MR. NASH:  That's not what this says.

14             MS. AXELROD:  That should be that.

15             MR. NASH:  Okay.  So 7 is the one

16   that's the most recent one.

17             MR. BERTHELSEN:  Okay.

18             MR. NASH:  2002 to 2007.

19             8 would be the contract that's dated

20   2001 to 2007.

21             9 would be the contract that's dated

22   1999 to 2003.

23             And then we wanted the Oilers --

24   Houston Oilers contract, 1995 to 1999.  That's

25   Joint Exhibit 10.

1          MR. BERTHELSEN:  What's the

2     difference between 7 and 8?

3          MR. NASH:  There was a -- I think a

4     renegotiation.  So 7 is just the very most

5     recent one, and then 8 is the one that was

6     directly before that, and then 9 was the one

7     that was directly before that, and then 10 is

8     the one that's directly before that.

9          MS. AXELROD:  We can give you copies

10    of these if you want.

11         MR. BERTHELSEN:  But 7 is the last

12    contract he signed.

13         MR. NASH:  Exactly.  And that's -- I

14    think for purposes of today, that's the one that

15    I'm going to talk about because I think we don't

16    need to go through each and every one of them.

17    The language is the same.

18          I think we're good on the contracts.

19    And so then the only other documents that we

20    will put in are the -- oh, the claim, yeah, the

21    Workers' Comp claim that was filed.

22         MS. AXELROD:  There was two of them.

23         MR. NASH:  There are two.

24         THE ARBITRATOR:  Exhibit 11.

25         MR. NASH:  That will be 11.  And we

1    got to make sure we give exact copies.

2              MR. BERTHELSEN:  That one I do want a

3    copy because I'm not sure what all you're

4    putting in.

5              MR. NASH:  Yeah.  It's the one, at

6    least as far as we can tell, the claim that was

7    filed.

8              So this would be 11.

9              (Marked Exhibit 11.)

10             MR. NASH:  And then there's another

11   claim which would be Joint Exhibit 12 -- no,

12   that's not it -- Joint Exhibit 12.

13             Here you go, Richard.

14             MR. BERTHELSEN:  Thanks.

15             MR. NASH: I don't think 11 would be

16   the original claim.

17             Then there's a letter that the Titans

18   sent to Mr. Matthews in August, I think, of '08.

19   We'll make that Joint Exhibit 12, unless you

20   want it to be a club exhibit.  But I don't think

21   there's any dispute about it.

22             MR. BERTHELSEN:  That's fine.

23             MR. NASH:  So this would be 11,

24   that's the Workers' Comp claim itself, and then

25   this will be 12.  This is a demand letter sent

1    to the player by the club concerning the breach.

2                  (Marked Exhibit 12.)

3                  MR. NASH:  I think, from our

4    perspective, in terms of what would be joint

5    exhibits, I think that's it.

6                  MR. BERTHELSEN:  Yeah.  I've got a

7    couple I'd like to add.  I don't think you'll

8    dispute them.

9                  MR. NASH:  Sure.

10                 MR. BERTHELSEN:  One, so I can put a

11   face on my client, Mr. Matthews, I have an

12   excerpt from the press guide or media guide, as

13   we call them.  Each club publishes one each year

14   about its current players, its past players.

15   This is an excerpt from the current guide which

16   describes Mr. Matthews, along with the other

17   Hall of Fame players who played for the Titans

18   or the Oilers.

19                 Okay.  This is the same guide.  It's

20   just --

21                 MR. NASH:  So do you want to make

22   that Joint Exhibit 13?

23                 MR. BERTHELSEN:  That's fine.

24                 MR. NASH:  It's fine with me.

25                 (Marked Exhibit 13.)

1          MR. BERTHELSEN:  And again, this is

2    just so the record has some personal information

3    about Mr. Matthews and his career with the club.

4    He's one of several people from the Oilers to be

5    inducted into the pro football Hall of Fame.

6    It's not often we have a grievance with a Hall

7    of Famer.

8          MR. NASH:  We will stipulate.

9          THE ARBITRATOR:  Clay Matthews?

10         MR. BERTHELSEN:  Well, yeah.  Clay

11   Matthews is his brother.  He now has a nephew, I

12   think, in the league.

13         MS. AXELROD:  Packers?

14         MR. BERTHELSEN:  Yeah.  I think he

15   was a first-round choice.  And I think his

16   father played, too, in the NFL.  Interesting

17   family.

18         Also, Mr. Nash mentioned the Workers'

19   Compensation claim in California.  I would like

20   to put in a copy of the petition for dismissal

21   that the Titans have filed in that case.  It was

22   filed by Mr. Buck, I believe.

23         MR. NASH:  Sure.  Let me just make

24   sure that's the --

25         MR. BERTHELSEN:  I have two other

```
 1    copies, here, I believe.  It bears on some of
 2    the same issues.
 3              This is 14; right?
 4              THE ARBITRATOR:  Yes.
 5              (Marked Exhibit 14.)
 6              MR. BERTHELSEN:  And have I given you
 7    a copy yet?
 8              THE ARBITRATOR:  No.
 9              MR. BERTHELSEN:  I took the liberty
10    of just noting to you that's 14.
11              My other one, we might have a little
12    debate about.  Maybe it will be better for me to
13    offer it as my own exhibit later, it's a copy of
14    a clause regarding Workers' Comp used by another
15    club, which I just want it to be, like, a
16    demonstrative exhibit.  I sent it to Blake the
17    other day.  It's the one used by the Cincinnati
18    Bengals.  Did you see it?
19              MR. NASH:  Yeah.  I just don't
20    understand what it would have to do with this
21    case.
22              MR. BERTHELSEN:  Well, why don't we
23    just address it during my presentation, and --
24              MR. NASH:  Sure.
25              MR. BERTHELSEN:  -- we'll keep it
```

1    clean for the time being.

2            MR. NASH:  I think we might as well

3    put in the player's brief in the California

4    case, as well.

5            MR. BERTHELSEN:  Okay.

6            MR. NASH:  We'll have to get copies

7    of that, but why don't we mark it as 15.  We'll

8    just get copies at the next break.

9            MR. GARDINER:  I notice this brief is

10   not signed.

11           MR. NASH:  That was provided to us in

12   discovery.

13           MR. BERTHELSEN:  That's what we have.

14           MR. NASH:  We're just putting in

15   whatever you gave us, so --

16           MR. BERTHELSEN:  Yeah.  I'm assuming

17   it was submitted.  At least it was represented

18   to me that it was.

19               (Marked Exhibit 15.)

20           MR. NASH:  Okay.  Any other

21   documents?

22           MR. BERTHELSEN:  I think that's it

23   for now.

24           MR. NASH:  Oh.  I'm sorry, one other

25   document.  If we're going to put in the

1  materials from the California case, then I would

2  put in the player's deposition transcript from

3  the California case.

4          THE ARBITRATOR:  That would be 16?

5          MR. NASH:  This will be 16.  Is that

6  right?

7          MS. AXELROD:  Yeah, Joint 16.

8          (Marked Exhibit 16.)

9          MR. NASH:  So I think that would

10  round it out.

11          THE ARBITRATOR:  Anything else before

12  we go on the record with opening statements?

13          MR. NASH:  I don't think so, no, not

14  for me.

15          MR. BERTHELSEN:  I don't think so.

16          THE ARBITRATOR:  Okay.

17          MR. NASH:  We're in good shape.

18          THE ARBITRATOR:  Mr. Nash, do you

19  want to make an opening statement here?

20          MR. NASH:  Yes, I would, Arbitrator.

21  Thank you very much.

22          This is a grievance filed by the

23  Tennessee Titans against Bruce Matthews, a

24  player who played for the Titans and the Titans'

25  predecessor, the Tennessee Oilers and the

1    Houston Oilers.

2                Mr. Matthews played for the club for

3    19 NFL seasons, I believe, from -- I think it's

4    from 1983 until 2002, when he retired.

5    Mr. Berthelsen said earlier he is a notable

6    player for the Titans, and we would agree, he is

7    certainly one of the Titans' and previously one

8    of the Oilers' greatest players, no dispute

9    about that, and he was paid accordingly.

10               He -- I believe if we collected --

11   we've put it in the record, Mr. Matthews'

12   contracts, and I believe over the course of his

13   career, he was paid somewhere in excess of

14   $50 million by the club.  So I don't think

15   there's any dispute that he was a great player

16   and, equally, he was an extremely

17   well-compensated player.

18               This grievance is about what the

19   Titans believe is Mr. Matthews' breach of a

20   promise that he made in receiving that

21   compensation over the course of his career.  And

22   the specific breach is Mr. Matthews' promise,

23   first when he played with the Houston Oilers in

24   Texas, where I believe he lives, and then

25   subsequently, when he played for the club in

1    Tennessee.

2           Mr. Matthews, in exchange for

3    substantial consideration, promised that any

4    Workers' Compensation claim that he would have

5    against the club would be filed either in Texas

6    or in Tennessee, the two places that he played

7    and Texas is where he lived.  That promise is in

8    all of the contracts that we have submitted into

9    evidence.

10           And as an example, I should probably

11   show it to you, and in Joint we -- the easiest

12   way, I think, to explain it is in Joint

13   Exhibit 7, that's the last contract that

14   Mr. Matthews signed with the club, and that has

15   the language that we're talking about here in

16   this grievance.  And I think the language

17   appears in all the contracts that we've put into

18   the record, going back to when he played for the

19   Houston Oilers.

20           And the specific language is on --

21   it's part of one of the addendums to the

22   contract.  I think it's the fifth printed page,

23   if you count the front and back.  There's a

24   Bates number at the bottom.  It would be page 16

25   in the bottom right-hand corner.

1              You've probably seen these kinds of

2    contract provisions before.  This is an addendum

3    to the player contract that Mr. Matthews

4    negotiated with the Titans, under which he

5    acknowledges receipt of the substantial

6    compensation provided in this contract.  On

7    page 16, you'll see this talks about the millon

8    dollars that he would be paid during the season

9    2002 through 2003.  And in that contract, under

10   paragraph 26-D, right down, you'll see that he

11   has promised that all Workers' Compensation

12   claims -- I won't read the language, it speaks

13   for itself -- but all Workers' Compensation

14   claims will be filed and resolved in accordance

15   with the laws of the State of Tennessee.

16              And then that contract provision

17   appears -- I won't go through each and every one

18   of them, we'll make this clear in our

19   post-hearing brief.  But it appears elsewhere in

20   this contract because if you go a couple of

21   pages later to the one that says 19 on the

22   bottom right-hand corner, you'll see again this

23   is in exchange for the $5 million in

24   compensation, there's another paragraph, 26-D,

25   that has the same promise.

1           And so basically -- and it goes on to

2    the next page, page 20 has the same provision;

3    page 21 and page 22 has the same provision, in

4    which he specifically acknowledges and agrees

5    that in exchange for the quite substantial

6    compensation that the club is paying him, he is

7    making this promise that Workers' Comp claims

8    will be filed in Tennessee.

9           Now, the same language appears in the

10   earlier contracts -- I won't go through all of

11   that.  We'll point that out in the briefs --

12   going back to the contract that we put into

13   evidence regarding the Houston Oilers.  So this

14   is a provision for which Mr. Matthews

15   specifically agreed, for which he was paid

16   millions and millions of dollars in

17   consideration, and which we contend in this

18   proceeding he has since breached.

19           The way he breached it -- and I don't

20   think there can really be much of a dispute that

21   he breached it -- is that approximately six

22   years after leaving -- five or six years after

23   leaving the club and retiring, I believe back to

24   Texas, Mr. Matthews filed a Workers'

25   Compensation claim in the state of California,

```
 1    not, I don't believe, in the state where he

 2    lives, but in the state of California.  And that

 3    claim is reflected in Joint Exhibit 11.

 4              So what happened is long after he

 5    retired from the club, sometime last year,

 6    Mr. Matthews decided that, notwithstanding this

 7    promise that he made in all of his contracts

 8    with the Oilers and then with the Titans and

 9    notwithstanding all of the money that he

10    received for that promise, he was going to

11    breach it and file a claim in California,

12    thereby not only breaching the provision, but

13    depriving the club of what it contracted for.

14    And what it contracted for was -- and we need to

15    be clear about this.

16              It's been -- it will be argued that

17    this is some -- this contract provision is some

18    sort of waiver of Mr. Matthews' right to

19    Workers' Compensation, and that based on

20    California law, which we don't believe has any

21    application here, that you shouldn't enforce its

22    promise.  It's not a waiver at all.

23              Mr. Matthews has always been and

24    continues to be fully entitled to Workers'

25    Compensation benefits.  There can't really be a
```

1    dispute about that.  The only question is where

2    those Workers' Compensation benefits claims

3    should be filed and processed.  They can be

4    filed and processed in his home state of Texas,

5    where he played for the Houston Oilers; they can

6    be filed and processed in Tennessee, as he

7    promised.  But where they can't be filed and

8    processed is in California.  And what

9    Mr. Matthews can't do, based on the promise in

10   his contract, is to require the club to have to

11   go out and hire lawyers in California and handle

12   claims out in California, which was exactly what

13   they negotiated they should not have to do.

14   And I don't think there could be any dispute

15   that he's in direct violation of that.

16           Now, you'll see in the record in

17   Joint Exhibit 12, once the claim came to the

18   attention of the Titans' legal department, a

19   demand letter was sent to him saying, you're

20   breaching your contract, and you need to cease

21   and desist.  It should be an August 5 letter

22   from I think the law firm is Seyforth & Shaw.

23   It should look like this.

24           Do you not have it?  It should look

25   like this.

1                MR. BERTHELSEN:  What's the date

2    again?

3                MR. NASH:  August 5, 2008.

4                I may not have given it to you, so

5    let me give it to you, just to make sure.

6                THE ARBITRATOR:  I have two in

7    evidence.

8                MR. NASH:  Oh, okay.  I'm sorry.

9                THE ARBITRATOR:  I do have it.

10   That's an extra one.  I have it.

11               MR. NASH:  You have it, okay.

12               So you'll see that the club sent a

13   letter to Mr. Matthews informing him that they

14   believed he was in breach of his contract and

15   asking him to come into conformance.  And when

16   he refused to do that, and when he continued --

17   and I think the record will show that he has

18   continued to press claims for Workers'

19   Compensation including -- and I think we put in

20   some briefs into evidence, so you can see that

21   he is -- his breach of the contract is

22   continuing to this day.

23               He -- the club ultimately then filed

24   the grievance, which I believe is Joint

25   Exhibit 2.  And that's why we are here today.

1          So as I said, I think this is -- it's

2     a straightforward case, from our perspective,

3     and I want to talk -- I don't think it can be

4     disputed that, based on the very clear and plain

5     language of the contract, Mr. Matthews breaches

6     that contract by filing a Workers' Compensation

7     claim and continuing to prosecute a Workers'

8     Compensation claim in California.

9          And to this date, the club is

10    continuing to incur the expenses and legal fees

11    of having to hire different lawyers out in

12    California to do this, as opposed to getting

13    what they bargained for and processing them

14    either in Texas or here in Tennessee.

15         So I don't know that even Richard

16    would argue that he's not in breach and isn't

17    continuing to be in breach, but let me talk

18    about what their defenses are.

19         They want to shift attention of this

20    case from the contract to the Workers'

21    Compensation dispute that exists out in

22    California.  And there's no question that we've

23    been forced to hire lawyers in California and

24    contest his right to do what he's doing in a

25    separate forum in California, and that's what

1    the briefs that have been submitted into the

2    record illustrate.

3         But you should not be misled or -- by

4    this defense that you're somehow being brought

5    into that dispute in California.  What we're

6    presenting in this arbitration has nothing to do

7    with the California proceeding.  It has

8    everything to do with -- and it is limited to

9    this collective bargaining agreement and this

10   particular contract.

11        There's a lot of precedent.  I won't

12   go into it in detail, but we have NFL

13   arbitration precedent on this point.  You should

14   know, and we'll explain in our brief, that there

15   have been a number of grievances over the past

16   few years over workers' Compensation.  And

17   Richard will certainly agree with that, I think.

18        And in particular, there have been

19   two decisions that have been issued that are

20   relevant by Arbitrator Das.  And ironically, in

21   both cases, Arbitrator Das granted the

22   grievances, in part, at least, filed by the

23   Players Association in which the Players

24   Association took what we believe is the opposite

25   position to what they're taking here, and that

1      is the arbitrator can certainly enforce the

2      contract and whatever happens in a state

3      Workers' Compensation proceeding shouldn't get

4      in the middle of that.

5              The first case involved is what we

6      call the Texas Workers' Comp case, and that was

7      a case where Texas law required the two clubs in

8      Texas, the Dallas Cowboys and the Houston

9      Texans, to give professional athletes -- this is

10     the way the Texas law is worded -- professional

11     football players, in their employ, a notice that

12     they had to elect either benefits under the

13     collective bargaining agreement for Workers'

14     Comp or benefits under state law.

15             And the Players Association said that

16     the Texas clubs were breaching the bargaining

17     agreement by forcing the player to choose

18     between state law benefits and CBA benefits.

19             And in defense, the clubs argued that

20     they were just complying with state law and that

21     the arbitrator shouldn't issue an award that

22     would be inconsistent with state law.  And

23     Arbitrator Das disagreed with us, agreed with

24     the Players Association, and said what happens

25     in state Workers' Compensation proceedings is

1   beyond the scope of this arbitration proceeding.

2              What he can do, and what he felt

3   obligated to do, was to enforce the CBA.  And so

4   he ordered a cease and desist order and ordered

5   the clubs in Texas not to give this election

6   form that was required by state law.  And he did

7   so, and he was careful -- and we'll explain this

8   in our briefs.  When you see the opinion, I

9   think it's clear to say that as the arbitrator,

10  under the collective bargaining agreement, he

11  was obligated to enforce the collective

12  bargaining agreement.

13             And that's exactly what he did, and

14  that's exactly what we're asking you to do here.

15  It's almost an identical situation.  We are

16  asking you to, as the arbitrator selected under

17  the collective bargaining agreement to hear

18  grievances and resolve disputes over the

19  contract, not over state law, somewhere else,

20  but over the contract, that we are entitled to

21  what the CBA provides for, and that is an

22  arbitrable award enforcing that contract

23  provision.

24             The other case, and I won't talk as

25  long about it, is another case involving several

1    clubs in Workers' Compensation, and Arbitrator

2    Das we believe, did a similar thing.  It was a

3    dispute over the meaning of paragraph 10 of the

4    player contract with regard to how Workers'

5    Compensation benefits should be calculated.

6              And there, too, Arbitrator Das made

7    clear that regardless of what his -- what

8    dispute was going on in the state law

9    proceedings, the Workers' Compensation

10   proceedings in either state court or

11   administrative proceedings, he was limited to

12   resolving the contract dispute under the

13   collective bargaining agreement, and that's what

14   he did.  And he issued a declaration about the

15   meaning of the player contract at issue.

16             So we believe that decision -- and

17   again, we'll have to provide that to you,

18   obviously, and discuss it in our post-hearing

19   brief.  But we believe that decision also makes

20   it clear that Mr. Matthews here cannot attempt

21   to avoid his clear promise and his breach of

22   that clear promise by turning this into a

23   dispute, as if we were sitting in California and

24   you were the California Workers' Compensation

25   judge.  That's not what this case is about.

```
1              And by the way, on that point, just
2    to -- Richard said earlier that there may be
3    questions that he believes that California
4    applies.
5              Just so that we're clear, if you look
6    at the player contracts, if you look at Joint
7    Exhibit 7, there's no dispute.  On page 14, the
8    third page of the player contract, it says what
9    law applies, and in that case it says the law of
10   Tennessee applies.  And it's true in the earlier
11   contracts that we put in the record, when he was
12   playing for the Houston Oilers, it said the law
13   of Texas.
14             You will find nowhere in any of these
15   player contracts California mentioned.  There's
16   no question that this is -- this is a -- to the
17   extent that state law applies here, it's
18   Tennessee and Texas.  And as I said, with
19   respect to Workers' Compensation, that's even
20   much more specific.  We have the provision that
21   we talked about earlier where, in terms of the
22   forum fcr -- it's not just that the law of
23   Tennessee applies to this contract, when it
24   comes to Workers' Compensation claims, there's
25   this choice of forum clause that says they will
```

1    be resolved in Tennessee and, under the earlier

2    contract, Texas.

3              So I think that's really the -- from

4    our perspective, the issue.  And I think it's

5    mostly something that we'll have to brief to

6    talk about the law that applies.  But as I said,

7    we think the governing law here is the prior NFL

8    arbitration decision on top of the clear

9    contract language.

10             And I -- I think the only other --

11   the only other point I would make about that is

12   that there's a separate defense, and that is

13   timeliness.  And the Players Association is

14   claiming that the grievance is untimely.  We

15   think that that's meritless for a number of

16   reasons.

17             The most obvious one is that you will

18   see that there was no mention in the Answer to

19   the grievance that's in Joint Exhibit 3 of any

20   timeliness defense, even though there's no

21   question that the facts upon which the grievance

22   was based are set forth clearly in the

23   grievance, and the claim that they are trying to

24   assert here for timeliness was -- if it had any

25   merit, which we don't think it does -- was

1    certainly something they knew or should have

2    known when they filed their Answer.

3            So there's a little bit of an irony

4    here going on that the player seems to be trying

5    to avoid his contractual responsibilities by

6    playing "gotcha" on timeliness, yet he himself

7    did not comply with the procedural requirements

8    by putting the timeliness defense in the answer,

9    the timeliness defense was asserted much later.

10            Now, Mr. Berthelsen will tell you

11   that the practice of the parties is to amend

12   answers, and I won't dispute that.  However, I

13   believe that the practice to amend answers has

14   been to amend answers based on new information

15   or as information in a case develops.  I don't

16   think there can be any question that the facts

17   upon which the timeliness defense was asserted

18   much later here were well-known to Mr. Matthews

19   and his representatives at the time he filed the

20   original answer in Joint Exhibit 3.

21            But in any event, there are two other

22   reasons why there's no merit to the timeliness

23   defense.  The second being that, as we put into

24   evidence, that before filing a grievance, the

25   Titans attempted to cure his breach.  They --

1     they sent him a letter, which is Joint

2     Exhibit 12.  That's the demand letter saying

3     you're in breach, please conform with your

4     contract obligations.

5                 And when he refused, the club filed

6     this grievance, and they did so within 45 days.

7     And we'll explain in our post-hearing brief that

8     there are past NFL arbitration decisions that

9     make, I think, the obvious point that a party

10    should not be found to be untimely in a

11    grievance simply because it tried to correct or

12    tried to avoid litigation by first asking the

13    other side to come into conformance with the

14    contract.

15                And then lastly -- the last reason

16    why the timeliness defense, we think, has no

17    merit is, as I said earlier when I was

18    describing what has been going on, this

19    violation continues to this date.  And I think,

20    maybe most obviously by even the documents that

21    Richard's put into the record in terms of this

22    briefing and the continuing litigation that's

23    going on in California, there's no question that

24    to this day, Mr. Matthews continues to breach

25    his contractual promise to resolve -- to file

1    and resolve Workers' Compensation disputes

2    either here in Tennessee or in Texas, and he

3    continues to do that.

4         So even if there were any merit to

5    their timeliness claim, which we don't think

6    there is, there's little question that his

7    violation is a continuing one and certainly

8    makes this a timely case.

9         So I think with that, I think

10   that's -- I just want to -- I don't want to get

11   into too many of the details because, as you can

12   see, this is an issue that has been the subject,

13   to different degrees, of other NFL arbitration

14   cases.  And I think without the benefit of us

15   providing you with those cases, and preferably

16   the briefs, I think that pretty well covers what

17   we see the issues are.

18        I'd like to just reserve a little bit

19   of time to respond to whatever Richard has to

20   say.

21        THE ARBITRATOR:  Will you provide me

22   with those decisions?

23        MR. NASH:  Absolutely.

24        THE ARBITRATOR:  Mr. Berthelsen.

25        MR. BERTHELSEN:  Yes.  I think we, as

1    a matter of custom and practice, consider our

2    past arbitration decisions to be part of every

3    record and as we do our brief.

4                MR. NASH:  No question.

5                MR. BERTHELSEN:  We normally attach

6    copies of the decisions, but you should also

7    have a full book of our decisions at your

8    disposal, and you can feel free to use them,

9    even without being directed to.

10               THE ARBITRATOR:  I'm not sure I have

11   a full book.

12               MR. BERTHELSEN:  I don't think you

13   do.

14               THE ARBITRATOR:  No.

15               MR. NASH:  But we'll make sure we

16   give you -- what we typically do is give you a

17   separate binder of the decisions that we cite in

18   our brief.  So we will certainly make sure we

19   get that to you.

20               THE ARBITRATOR:  Very good.

21               MR. BERTHELSEN:  Okay.  My turn?

22               THE ARBITRATOR:  Yes, it is.

23               MR. BERTHELSEN:  I agree with

24   Mr. Nash, basically, as to the issue in this

25   case being whether or not the paragraph in

1     Mr. Matthews' contract concerning Workers' Comp,

2     that's paragraph 26-D, the issue being whether

3     that prevents him from filing a Workers' Comp

4     claim in California, stated in its most simple

5     form.  And I think that's the inquiry that you

6     have to make, as you look at the evidence and

7     look at the arguments of the parties, does that

8     paragraph 26-D prevent him from filing in

9     California.

10          We've given you a lot of paper here,

11    but I don't think you even have to read much of

12    the paper.  Frankly, I think you just have to

13    read the clause, paragraph 26-D.  But what I'm

14    going to now describe to you is what we think

15    are three independent reasons for answering the

16    questions as to whether he can file in

17    California in the affirmative.

18          Mr. Matthews has that right, both

19    under the clause in question, that's reason

20    number one.  He has that right under Tennessee

21    law, that's reason number two.  And he also has

22    that right, legally, under federal law and

23    California law, and that's our point number

24    three.

25          So let me first address point number

1    one, and that is the wording of the clause

2    itself.  I think it's significant that even

3    though Mr. Nash took about 20 minutes to make

4    his opening argument, not once during that

5    argument did he read you the clause.  Not once

6    did he go through each of the words in that

7    clause with you.

8            And I think that's because the

9    wording does not really help his case.  And to

10   illustrate my point, let's look at, first, the

11   grievance itself, if you would.

12           THE ARBITRATOR:  Joint Exhibit 7?

13           MR. BERTHELSEN:  Joint Exhibit 2.

14           THE ARBITRATOR:  Yes.

15           MR. BERTHELSEN:  Yes.  After the CBA

16   was the first exhibit that we identified.

17           I have an extra copy.

18           THE ARBITRATOR:  I'm just taking this

19   opportunity to organize here.

20           MR. BERTHELSEN:  Sure.  I'm going to

21   refer you to the second page of that document

22   first.

23           THE ARBITRATOR: Okay.

24           MR. BERTHELSEN:  The first full

25   paragraph at the top of page 2 states,

```
 1                    "Furthermore,

 2          consideration was given to

 3          Matthews by the Titans for

 4          Matthews knowing waiver of his

 5          right -- or his rights to file

 6          his Workers' Compensation claim

 7          against the Titans outside the

 8          state of Tennessee."

 9               Now, Mr. Nash just said to you that

10      he doesn't claim that there's been a waiver in

11      this case, but that's directly contradictory to

12      what his grievance says.  The grievance says

13      that the clause in the contract representing --

14      represented a knowing waiver of his rights to

15      file against the Titans outside the state of

16      Tennessee.

17               But now I want you to look at the

18      clause itself, 26-D, the wording of the clause.

19      And the --

20               THE ARBITRATOR:  Just a minute.

21               Sorry.  Go ahead, Mr. Berthelsen.

22               MR. BERTHELSEN:  The clause itself is

23      quoted on the first page of the grievance, same

24      document you just looked at, at the first page.

25               Are you with me?
```

1              THE ARBITRATOR:  Uh-huh.

2              MR. BERTHELSEN:  Okay.  This is the

3    clause that Mr. Nash relies upon.  But what I'm

4    going to stress to you -- and I think after you

5    see our brief, you're going to be convinced of

6    this -- that in the law of contracts, there's

7    something called a choice of law clause, and

8    there's also something called a choice of forum

9    clause.

10             And if you looked at Williston on

11   Contracts or Corbin on Contracts, they'll tell

12   you that a choice of law clause basically says

13   that when the parties have a dispute, the law of

14   a particular state applies to it.

15             Now, the law -- the case could be in

16   some other jurisdiction.  And, in fact, you'll

17   see all kinds of cases in various circuit courts

18   around the country where the parties have chosen

19   to make New York law the governing law of their

20   contracts.  But the case can be in San

21   Francisco.  The case can be in Houston.  The

22   case can be in Miami.  It doesn't prevent the

23   party from filing in another jurisdiction.  It

24   only says that when you do that, when you file,

25   then the law of the state specified in the

1    contract applies.

2              Now, a choice of forum clause, on the

3    other hand, says where you can file your case.

4    And as I pointed out before, Mr. Nash didn't

5    review this paragraph with you, and it's perhaps

6    because you can read that paragraph and you will

7    not see anything in it that says that

8    Mr. Matthews cannot file in another

9    jurisdiction.  This is a choice of law clause.

10   It is not a choice of forum clause.

11             Now, it's interesting, and I think

12   pretty persuasive, that if you again look with

13   me at the first page of the grievance, the

14   sentence which introduces the clause says as

15   follows:  Quote,

16                  "Each of those

17             contracts" -- referring to Bruce

18             Matthews' player contracts --

19             "included a choice of law

20             provision, 26-D, which

21             provided,"

22   and then they go on to quote.

23             They themselves characterize it as a

24   choice of law provision and not as a choice of

25   forum provision.  And that's for good reason.

1   Because, as you read the clause, and I'll again
2   ask you to look at that first page of the
3   grievance, let's look at what it actually says.
4   It says, "jurisdiction" -- and I would
5   underscore the word "jurisdiction" there -- it
6   says,
7               "Jurisdiction of all
8           Workers' Compensation claims and
9           all other matters related to
10          Workers' Comp, including
11          paragraph 10, and including all
12          issues of law, issues of fact,
13          and matters relating to Workers'
14          Compensation benefits, shall be
15          exclusively determined by and
16          exclusively decided in
17          accordance with the internal
18          laws of the state of Tennessee."
19          It doesn't say that they'll be
20  decided only in Tennessee, it just says that
21  jurisdiction will be decided in accordance with
22  the laws of Tennessee.  And that is a very, very
23  significant point in this case.  And I think
24  it's perhaps the most important point for you to
25  understand, at least from our perspective.

1                If this were, in fact, instead a

2    choice of forum clause, the clause would state

3    very clearly -- and it's obviously very easy to

4    do this -- the Titans have good lawyers.  The

5    clause would state that in addition, any claim

6    that's filed for Workers' Compensation by

7    Mr. Matthews must be in the state of Tennessee,

8    or it could say Mr. Matthews, by this clause, is

9    not allowed to file any claim in any other

10   jurisdiction other than Tennessee or other than

11   Texas.

12               And I'm going to offer to you a

13   clause that is used by one other club in the

14   National Football League, the Cincinnati

15   Bengals, which illustrates my point.  That

16   clause -- and you don't have to you memorize

17   this, I'll show is it to you later -- that

18   clause says,

19               "As a material

20           inducement for the club to

21           employ player services, player

22           promises and agrees that any

23           Workers' Compensation claim,

24           dispute, or cause of action

25           arising out of his employment

1            shall be subject to the Workers'

2            Compensation laws of Ohio

3            exclusively, and not the

4            Workers' Compensation laws of

5            any other state."

6                  The Titans' laws doesn't say that.

7     And here's the additional sentence.

8                     "Player further agrees

9            that any claim, filing,

10           petition, or cause of action in

11           any way relating to Workers'

12           Compensation or benefits arising

13           out of his employment, including

14           the enforceability of this

15           addendum, shall be brought

16           solely and exclusively with the

17           courts of Ohio."

18                  Now, conspicuous by its absence in

19    this case is such a clause.  As a result of

20    that, what we have is a choice of law clause,

21    not a choice of forum clause.  Bruce Matthews is

22    not, by the very wording of the Titans' clause

23    here in 26-D, required to file in Tennessee.

24    Nothing in that clause says that.  He's not

25    prevented, under the terms of this clause, from

1    filing in any other state.

2              That is abundantly clear.  And if the

3    Titans intended, as Mr. Nash argues, that he not

4    be allowed to file in another state, then they

5    could have put that sentence in this clause.

6    They could have said Mr. Matthews can only file

7    in Tennessee or Texas.  They could have said he

8    cannot file in California or any other

9    jurisdiction.  And they failed to do that.

10             So it is a basic principle of

11   contract law -- and again, we'll cite authority

12   for this in our brief -- that when you have a

13   choice of law clause, you can file anywhere in

14   this country.  If you have a choice of forum

15   clause, you can only file where that clause

16   allows you to file.  And it would have been very

17   easy for the Titans to have this clause say that

18   it was a choice of forum, but they failed

19   completely to do that.

20             And again, I point you to the Answer

21   itself, which -- I'm sorry -- the Grievance

22   itself, which actually states that it's a choice

23   of law clause.

24             Now, it's interesting, by contrast,

25   that when they filed against Mr. Matthews in the

1    state of California and said his case should be

2    dismissed, you'll see after reading Mr. Buck,

3    the attorney, Mr. Buck, in California who they

4    hired, he characterizes this clause all the way

5    through his papers the choice of forum clause,

6    not as a choice of law clause.  Now, he's

7    incorrect, as you can see from reading it, but

8    he characterizes it as a choice of forum clause.

9              Well, I think that shows us that the

10   lawyers representing the Titans know the

11   difference between the choice of forum clause

12   and the choice of law clause.

13             So I think I've made my point that

14   Mr. Matthews, by the express terms of paragraph

15   26-D, is not prevented or precluded from filing

16   elsewhere.  He is not required to file only in

17   Tennessee or Texas.

18             Now, Mr. Nash made a big issue out of

19   saying that Mr. Matthews got paid $50 million

20   over his career.  And he represented to you as

21   saying that that was, in part, consideration for

22   his agreement to the Workers' Comp clause.  I

23   may be missing something, but I don't see

24   anything in paragraph 26-D, the provision he

25   relies upon, that says that in return for

1    getting some sum of money, Mr. Matthews is

2    agreeing to paragraph 26-D.

3              It doesn't say that at all.  But the

4    Bengal's clause, I'll give you, does say that.

5    It says as a material inducement for the club to

6    employ a player's services, that's point number

7    one.

8              Point number two, and I don't think

9    Mr. Nash will dispute this --

10             THE ARBITRATOR:  Would you read me

11   the Bengal's numbers?

12             MR. BERTHELSEN:  Well, I'm prepared

13   to offer it as Players' Exhibit 1.  I think

14   Mr. Nash is going to object.  Maybe now is the

15   time to argue that out.  But since I've read it,

16   maybe the best way is to show it to you.

17             What do you have to say about that,

18   Dan?

19             MR. NASH:  Well, yeah, sure, I object

20   to it because I think however the Bengals have

21   decided to negotiate their contracts is not

22   relevant to the Titans and Mr. Matthews's

23   contract here.

24             THE ARBITRATOR:  So you object to

25   this?

1          MR. NASH:  I don't think it's

2     relevant, yeah.  This is a separate club, a

3     different player.  I don't see how it bears --

4     what the Bengals choose to do and what the

5     player in that contract have chosen to do is --

6     I don't see how that's relevant.

7          THE ARBITRATOR:  Mr. Berthelsen, why

8     is it relevant?

9          MR. BERTHELSEN:  As I said before,

10    it's demonstrative of the point that if they

11    intended this to be a clause that confined him

12    to a filing in Texas or Tennessee, they could

13    have easily had it so state.  And this is 32

14    teams in one league represented by the same

15    lawyers, the NFL Management Council.  It's not

16    as if this is a different sport, different

17    business, different environment.  This is

18    another team in the National Football League

19    who's represented by the NFL Management Council.

20          But also, I think, obviously, both

21    sides have accepted you as an arbitrator.  We

22    trust you to base your decisions on what's

23    relevant.  I think we've had a pretty liberal

24    custom and practice of allowing exhibits to come

25    in and allowing the arbitrator to determine

1    later what relevance, if any, the exhibit might

2    have.

3                THE ARBITRATOR:  I think that given

4    the fairly low standard of relevancy, I'll

5    overrule it.  So it is in evidence.

6                Evidence having any tendency to make

7    more or less likely an issue will suggest that

8    this is relevant.  But since there's no special

9    standard how much weight it deserves, I think is

10   another question that I will take up in the

11   decision making stage.  But I'll overrule the

12   objection as to relevancy.

13               MR. BERTHELSEN:  Now, I also wanted

14   to point out, for the record -- and I don't

15   think this will be disputed -- Mr. Matthews was

16   not represented by anyone in his contract

17   negotiations after the year 1995.  That is

18   something he testified to in the deposition that

19   Mr. Nash offered into evidence.

20               I'm not suggesting to you that Bruce

21   Matthews looked at this and says, well, looks

22   like it's a choice of law clause versus a choice

23   of forum clause.  I'm suggesting to you that

24   this is not something that would have been

25   negotiated between the parties, this is

```
 1    something -- and unless I'm wrong here, Mr. Nash

 2    can show me -- this is a clause which the club

 3    drafted and put into the contract.  And so they

 4    had full power and control over what it would

 5    say.  And it falls far short of being what

 6    Mr. Nash said it is, which is a clause that

 7    prevents, by its terms, Mr. Matthews from filing

 8    elsewhere.

 9              MR. NASH:  Did you want me to

10    respond to that?

11              MR. BERTHELSEN:  No.  I'm sure you

12    will.

13              MR. NASH:  Okay.  I will.

14              MR. BERTHELSEN:  Now, let me get to

15    reason number two.  Reason number one, was that

16    it's a choice of law clause, not a choice of

17    forum clause, doesn't prevent him from doing

18    anything.  What the clause does do is to say

19    that Tennessee law will apply.

20              Well, let's look at Tennessee law.

21    Tennessee law very clearly allows an employee in

22    Tennessee to file a Workers' Compensation claim

23    in another jurisdiction.  It's contemplated by

24    the statutes in Tennessee, and there's very

25    clear case law that establishes this point.
```

1    And, you know, it's rare, as a lawyer, that you

2    get to cite a decision of Justice Brandeis of

3    the U.S. Supreme Court in support of a

4    proposition, but we actually have that in this

5    case, and we'll go into more detail in our

6    brief, but there's a case known as State of Ohio

7    vs. Chattanooga Boiler.  And no, I don't know

8    how to spell Chattanooga.  She does, okay.

9           That is a case, an old case, goes

10   back to the 1930s where a Tennessee employee was

11   working in Ohio on assignment from the employer,

12   had a work accident and died.  The employee's

13   widow brought a claim in Ohio, your home state,

14   for the death benefit provided by the Workers'

15   Comp laws by the State of Ohio.

16           Then the employer claimed that the

17   State of Tennessee had exclusive jurisdiction

18   over that benefit and the case went all the way

19   to the U.S. Supreme Court.  And Justice

20   Brandeis, in authoring the decision,

21   specifically stated that filing in another state

22   is allowed by Tennessee law and, therefore, the

23   employer was wrong.

24           There's another case we'll cite to

25   you in our brief captioned True, T-r-u-e, vs.

1    Amerail, A-m-e-r-a-i-l, Corporation, a later

2    case following the Chattanooga Boiler case.

3    It's a Tennessee decision in 1979, had a similar

4    ruling with regard to a Tennessee employee

5    injured in Virginia.

6              So as we apply Tennessee law, the

7    jurisdictional law, by the way, of the State of

8    Tennessee which is what 26 -- 26-D says.  It

9    says, jurisdiction of all claims are to be

10   decided -- is to be decided in accordance with

11   the laws of Tennessee.  The laws of Tennessee

12   addressed jurisdiction, and they say a Tennessee

13   employee can file elsewhere.  That's what

14   happened in Chattanooga Boiler, that's what

15   happened in the True case, that's what happened

16   in the Bruce Matthews case.

17             So he can clearly file in California

18   and claim their benefits pursuant to the law

19   Mr. Nash is relying on, the law of the State of

20   Tennessee.

21             Now, let's get to reason number

22   three, and let me put this, perhaps, in

23   hypothetical terms.

24             What if Mr. Nash called me and said,

25   you know, Bruce Matthews filed a Workers' Comp

1   claim in California, and we believe that's in

2   violation of clause 26-D of his player contract.

3   And I said, you look like you're right, Dan,

4   let's go to Arbitrator Sharpe and we will have a

5   stipulated decision that he's in breach of his

6   contract.  And we'll have the arbitrator enter

7   that as a decision.

8            You know what, we'd all be wrong. And

9   what we did would most likely be vacated by the

10  courts of California, by the federal courts in

11  our country, and by the U.S. Supreme Court.  And

12  I got lucky twice here.  On this proposition, I

13  also have a U.S. Supreme Court case.  And last

14  time I checked, those cases govern us all.  And

15  the case I'm going to cite to you and describe

16  briefly is a case that's called Alaska Packers.

17  It's a case where an employee of a salmon

18  fishing and packing company was hired in

19  California but sent to Alaska to catch salmon.

20           The employment contracts said that

21  the employee, if injured on the job, had to file

22  Workers' Comp, if he got hurt, under the laws of

23  Alaska.  And at the time of this case, I don't

24  think it was a state, it was a territory of the

25  U.S., not that that would make a difference in

1    the outcome of the case.

2              The U.S. Supreme Court ultimately

3    ruled when the California employer said that it

4    could only be filed in Alaska, that no employee

5    and his employer could waive their rights under

6    California law.  Under California law, any

7    California employee or anyone injured in

8    California, various jurisdictional points, is

9    allowed to file Workers' Comp.  And in the

10   California statutes, it specifically states that

11   no one can contract away that right.

12             And subsequently, that same rule of

13   law has been implied -- applied to unions and

14   employers, collective bargaining agreements.

15   There have been cases in California, and

16   elsewhere, where the employer was agreeing with

17   the union as to something that conflicted with

18   California Workers' Compensation law.  And

19   again, the Supreme Court of our country ruled

20   against their ability to do so.

21             And the point of law that's made in

22   all of these cases is that, on the one hand,

23   employers and unions are allowed to make

24   agreements.  On the other hand, however, if

25   those agreements compromise in any way state

1    statutory efforts to promote public safety or

2    protect minimum labor standards of employees,

3    they are a nullity, those provisions.  There are

4    certain basic standards set by state law that

5    unions, employees, employers, they just can't

6    change.

7              The law is that they can make them

8    better.  For example, if there's a minimum wage

9    law in the state of California that says

10   somebody gets $15 an hour, the employer in the

11   union can agree that minimum wage is $20 an

12   hour.  On the other hand, conversely, in that

13   same situation, the union and the employer can't

14   agree that the minimum wage would be less than

15   what the state says.

16             Now, employers don't like this,

17   obviously, but it happens that the better

18   benefit, that is, if you have a CBA on the one

19   hand that provides a better benefit, that's what

20   the employee gets.  However, if the state

21   provides a better benefit, that's what the

22   employee gets.

23             Mr. Nash said to you before, well,

24   the union has, in the past, accepted the notion

25   that it's the CBA that applies and the state

```
 1    laws don't.  My answer to that is it depends on

 2    the case.  If they're contending that a player

 3    has waived his rights under California law, I'm

 4    the first one to come in to say, no, he hasn't.

 5    First of all, the clause doesn't say that, but

 6    secondly, he's not allowed to do that.  The U.S.

 7    Supreme Court won't allow him to do that.  And

 8    our brief is going to make that point very clear

 9    to you.

10              Let me just describe one other case,

11    a more recent case than Alaska Packers, called

12    Contract Services Network vs. Aubrey.  That's

13    the case where I believe the union and the

14    employer agreed Workers' Compensation benefits

15    would be paid out of some separate fund, some

16    ERISA fund that they had.  And that was

17    challenged.  And again, the -- in this case the

18    Ninth Circuit ruled that, no, California law

19    says that California jurisdiction Over Workers'

20    Comp allows employees to get Workers' Comp

21    benefits under the laws of the State of

22    California, and that could not be waived.  That

23    cannot be contracted away.

24              So clearly, if paragraph 26-D of

25    Bruce Matthews' contract is asserted here as a
```

1   preclusion of California law, it would be struck

2   down.  If we all agreed on a stipulated

3   arbitration decision, it would be vacated upon

4   motion by Mr. Matthews or his attorney in

5   California with the court saying, those people

6   can't waive his rights to California Workers'

7   Comp.  Didn't they read the Alaska Packers?

8   Didn't they read the Metropolitan Life decision,

9   Contract Services Network decision?  It's

10  abundantly clear under the law.

11         Now, Mr. Nash referred to past

12  arbitration cases that we've had.  Well, this

13  very issue has come up in another sport, arena

14  football.  There's actual cases now in

15  California.  The one in question is Brache,

16  B-r-a-c-h-e, vs. Tampa Bay Storm.  Tampa Bay

17  took the position, just as Mr. Nash is here,

18  that a player employed by a Florida team could

19  not file in California.  The California court

20  looked at that and said, no, no one can waive

21  their rights under our statute.

22         By the same token, the Tampa Bay team

23  filed a grievance against the player saying he

24  couldn't do it, and the arbitrator ruled the

25  same way.  And those cases are pretty much on

1    all fours.  In that particular case they argued

2    that something the union agreed to barred the

3    player from filing in California, but it's still

4    the same principle.

5            Now, Mr. Nash has emphasized before

6    that there was no waiver here.  They're not

7    claiming that Mr. Matthews waived anything, but

8    their grievance says otherwise.  They say he

9    made a knowing waiver.

10           Well, if that's true -- and we don't

11   concede that it is because of the wording of the

12   clause -- but if that's true, that waiver is

13   illegal.  Our federal courts have said so.  It's

14   not just California.  It's the U.S. Supreme

15   Court that has said so.

16           So three independent reasons.  One,

17   the wording of the clause.  It's a choice of law

18   clause, not a forum clause; two, under the

19   clause applying Tennessee law as it instructs,

20   Bruce Matthews is perfectly well entitled to

21   file a claim in California, and the case law

22   establishes that; and number three, if we're to

23   accept Mr. Nash's assertion that this is a

24   choice of forum clause and that he can't file in

25   California, it flies straight in the face of

1    federal court decisions that bind us all and

2    would likely be vacated in federal court if

3    there were an arbitration decision to the

4    contrary.

5            So I think fortunately here, you

6    don't have to go that far.  You don't have to

7    get to my third point and make any rulings about

8    applicable law of any other states or U.S.

9    Supreme law because, as we pointed out

10   previously, the clause in question need not and

11   should not be interpreted to prevent Bruce

12   Matthews from filing in California.  It's a

13   choice of law clause, at most.  They called it

14   that in their grievance.  That's what it is, and

15   as such, it should be left up to the court in

16   California to determine what happens with

17   Matthews' claim.

18           And the rest of us, including you,

19   Mr. Nash, and I, should all let that happen.

20           THE ARBITRATOR:  Thank you.

21   Mr. Berthelsen.

22           Mr. Nash, would you like to reply?

23           MR. NASH:  I'd like to make a few

24   comments.  Let me just immediately address the

25   point that Richard made a couple times, in which

```
 1      I claim that there's no waiver here.  That's not
 2      what I said.  And let me be clear what I said.
 3                  What I said earlier was that
 4      Mr. Matthews did not waive his right to Workers'
 5      Compensation benefits.  But he did agree
 6      specifically that those benefits would -- and
 7      claims for those benefits would be filed in
 8      either Texas or Tennessee and they would be
 9      processed in accordance with either Texas or
10      Tennessee law.
11                  Did he waive his right to file in
12      California and to seek benefits under California
13      law?  Absolutely.  I completely agree with that.
14                  But Richard, a number of times, tried
15      to make it seem like I was contradicting our
16      grievance, and that's just not the case.
17      There's no question -- and the important point
18      here is that this is not a case in which they
19      can credibly claim that Mr. Matthews is somehow
20      being deprived of the right of Workers'
21      Compensation.  That was my point.  And the only
22      question is where can he do that, and how should
23      those benefits be determined.
24                  And there's no question that, in this
25      contract language, that he has agreed
```

1    specifically that he was limited to doing that

2    either in Texas or in Tennessee.

3                Now, Richard talked a lot about the

4    difference between a choice of law and a choice

5    of forum clause.  I would argue that there may

6    be some semantics going on here, but let's just

7    talk a little bit more about that.

8                First of all, there is a choice of

9    law clause in each of Mr. Matthews' contracts,

10   and I think I pointed it out to you earlier.

11   It's in paragraph 22 of each of the contracts,

12   starting with Joint Exhibit 7.  And in Joint

13   Exhibit 7, as the example, the choice of law

14   clause is the law of Tennessee will govern.  But

15   the language that we're relying on here in

16   paragraph 26-D of Joint Exhibit 7 to the

17   addendum is much more than a choice of law

18   provision.  It is clearly also a choice of forum

19   provision.

20               And you can tell that in a number of

21   ways.  It says -- and I think I said to you

22   earlier that you're going to hear a lot of

23   arguments about different laws, and we believe

24   that those arguments are being thrown up as

25   something of a smokescreen, to be blunt, because

1    they can't credibly claim that if you read this

2    language as a whole, that the intention here is

3    that Workers' Compensation claims by

4    Mr. Matthews would be subject exclusively to the

5    jurisdiction of either Texas or Tennessee, which

6    obviously means that's where they should be

7    filed.  And so that obviously includes the

8    forum.

9            Now, Richard talked about the briefs

10   that have been filed in California, and he said

11   that the lawyers know what they're talking

12   about, and I would agree with him.  And one of

13   the reasons I would agree with him is that

14   Mr. Matthews' lawyer in California has called

15   this provision a forum selection cause.  And

16   that's in Joint Exhibit 15 on page 11.

17           I haven't made copies of this for you

18   yet, but I will.  And we'll put this into the

19   record that we've identified it.  I think it is

20   in the record.

21           But you will see -- I can just show

22   it to you here -- but this is what Mr. Matthews'

23   lawyer calls the clause at issue here.  He calls

24   it a forum selection clause.  You can't read his

25   brief in California and you can't come to any

1    reasonable conclusion or interpretation of this

2    language, other than everybody knows that what's

3    at issue here is not only what law should govern

4    his claims, but where the claims need to be

5    filed.

6         And as I said, there's a very

7    practical reason.  There's a reason why the

8    Titans paid as much money as they did for this

9    promise, and one of them is why should they have

10   to go and hire lawyers in a state where

11   Mr. Matthews doesn't live, hasn't lived for

12   many, many years, and where he lives in Texas,

13   he played in Texas, and he played in Tennessee.

14   It's perfectly reasonable and appropriate for

15   them to contract for that bargain.  And I don't

16   think any reasonable interpretation of this

17   language can be made otherwise.

18        Now, Richard said that the language

19   doesn't include anything about the money being

20   paid under this contract is in consideration for

21   this paragraph, but that's not true because on

22   the first page, in the recital, the contract

23   says this contract, this entire contract,

24   including the paragraph that we're relying on,

25   it says,

```
 1                    "In consideration of the

 2            promises made by each other,

 3            player and club agree as

 4            follows."

 5                 It's on page 1 of the player

 6      contract.  So I don't think you can make a

 7      reasonable argument that he wasn't paid the

 8      money in exchange for this promise.

 9                 And by the way, on the point that

10      somehow Mr. Matthews was not represented by an

11      agent, he was certainly represented by an agent

12      when this language was first agreed to when he

13      played for the Oilers.  His agent's name was

14      Howard Slusher.  But in any event, there's no

15      dispute, and I think it's made clear in his

16      deposition, that Mr. Matthews freely agreed to

17      this contract, that he certainly accepted the

18      millions and millions of dollars willingly in

19      exchange for this promise.

20                 So I don't think there could be a

21      reasonable argument that somehow this was forced

22      on him.  I think we're well past the day in the

23      NFL where a player, who's made this many

24      millions of dollars, that somehow this was all

25      forced on him by the club.  This was certainly a
```

1    free and voluntary agreement.

2              I want to address -- so I think,

3    really, the main response I want to have is the

4    one that goes to what is really at issue in this

5    case, and that is how do you interpret this

6    contract.  And that was really point number one

7    that Richard made.  And he made two other

8    points, but I want to focus on point number one.

9    And I think you can't read this provision and

10   you can't apply it to the facts here and not

11   come to the conclusion that he has agreed to

12   file his Workers' Compensation claims either in

13   Texas or in Tennessee, and he's breached that.

14             Now, about the cases that were thrown

15   at you, I'm going to reserve to the post-hearing

16   brief.  I don't think you heard very accurate

17   descriptions of the cases, but we'll argue about

18   that in the brief.

19             But in terms of Tennessee law

20   applying, as I said, there's no question

21   Tennessee law applies.  I don't believe the

22   cases that were described to you support the

23   view that Mr. Matthews can't agree in his

24   contract for good consideration to file his

25   claims in Tennessee.  That's number one.  I

1    don't think there was any sort of contract

2    language that was involved in those cases.

3            But number two, even if you accept

4    Richard's argument that Tennessee law should

5    govern, Mr. Matthews is still in breach because

6    in California, he's arguing that Tennessee law

7    doesn't govern.  If you accept Mr. Berthelsen's

8    argument that this is just a choice of law and

9    he's free to go file in another state based on

10    this Ohio vs. Chattanooga Boiler case and the

11    True case, but that's not what he's doing.  He's

12    rejecting entirely his contract provision.  And

13    so there's no question that he's in breach.

14            Now, the last point about this -- if

15    you issued a ruling enforcing the clear language

16    of the contract as agreed to, that you would

17    somehow be subject to violating federal law,

18    that is simply not correct.

19            Ironically, as I said earlier, we

20    have had situations where arguments have been

21    made about where the line is between the

22    arbitrator's role and what the courts of the

23    state should do in terms of how their state laws

24    apply.  In both cases, Arbitrator Das said, I am

25    not going to concern myself with what might

1    happen in the Texas courts, how they may view

2    this or what might happen, I think, in the

3    New York or Ohio courts, in the other cases,

4    what I'm going to concern myself and what I'm

5    supposed to concern myself with, as the

6    arbitrator under the collective bargaining

7    agreement, is construing the collective

8    bargaining agreement and construing the contract

9    language at issue. And so -- and in that case,

10   that's exactly what he did, and we'll explain

11   that in our brief.

12            Now, another irony here is that in

13   both cases, Richard said that if you issue a

14   decision sustaining the grievance and applying

15   the clear language of the contract, you'll

16   somehow be vacated. Both of those decisions,

17   the Players Association went to federal court

18   and actually got them confirmed, and they were

19   confirmed. So I get confused by that.

20            In any event, though, there is plenty

21   of law that will contradict what you heard about

22   whether or not this is a waiver and whether a

23   player can waive in a collective bargaining

24   agreement. For one thing, we're not talking

25   about solely a collective bargaining provision.

```
1    What we're talking about is an individually
2    negotiated provision here between Mr. Matthews
3    and the club, which he freely agreed to this.
4    That alone distinguishes these cases.
5           But again, in terms of the law on
6    whether an employee or whether a union can agree
7    to certain choice of law or choice of forum
8    clauses, there's a recent Supreme Court case,
9    the Preston case, that I think makes very clear
10   that under the Federal Arbitration Act, for
11   example, that an agreement that a particular
12   forum will be used to resolve a claim is fully
13   enforceable.
14          But again, I don't see how we can
15   meaningfully argue the cases back and forth
16   without giving you the benefit of having the
17   opportunity of reading those cases.
18          Suffice it to say, I think
19   arguments 2 and 3 that were just made are red
20   herrings, that they are -- they are very -- I
21   mean, Richard's -- my compliments.  He's always
22   an effective advocate.  He knows that
23   Mr. Matthews is in deliberate breach of his
24   contract here, and he's going to do the best he
25   can.
```

1                    But even if he's right about what

2       federal law is on waiver and the like, that's an

3       issue for the courts to decide.  It's not an

4       issue to be decided here.  And what we will

5       explain in our brief and what we would urge is

6       that you follow the same exact course that

7       Arbitrator Das has followed, twice in similar

8       circumstances.

9                    And so the issue really is construing

10      this contract language itself and determining

11      that Mr. Matthews is in breach.

12                   THE ARBITRATOR:  Okay.  Thank you

13      very much.

14                   MR. NASH:  Thank you.

15                   MR. BERTHELSEN:  Do I get another

16      turn or not?

17                   THE ARBITRATOR:  Well, I mean --

18                   MR. NASH:  I think we need the

19      briefs, really.

20                   MR. BERTHELSEN:  There is something I

21      forgot, and that's the issue of timeliness.

22                   May I address that?

23                   MR. NASH:  Go ahead.

24                   MR. BERTHELSEN:  Okay.  Yes, we did

25      raise timeliness.  Mr. Nash made the point that

1    we didn't raise timeliness in the original

2    Answer to the grievance but did so through a

3    supplemental Answer.  That has been the custom

4    and practice of the parties for a very long

5    time.  But even lacking that, we have had past

6    arbitration decisions.  I think the Mike Kenn,

7    K-e-n-n, case is the first one that says that a

8    party may raise a defense at any time prior to a

9    hearing in the case, and it will be considered.

10            And that's our arbitration precedent,

11    and there's been no effort by the Management

12    Council to change that precedent through any

13    subsequent bargaining or renegotiation of our

14    grievance procedures.  So let me make it clear

15    on the record.

16            They have the right, we have the

17    right to raise a defense at any time before the

18    hearing and probably at the hearing as well.

19    I've got to check the decisions myself, but

20    certainly before the hearing.  And we did that

21    here.

22            I expected to hear testimony today

23    from the club that indicated when it first was

24    informed of this filing.  This record's not

25    going to show when that was, but we may give

1    consideration to removing this defense, I'm not

2    sure.  And we will notify you and Mr. Nash

3    accordingly.  It's just that I didn't want to

4    have his point about amending an answer to go

5    unanswered.

6              The only other thing was Mr. Nash

7    made reference to our confirming a couple of

8    arbitration awards in court.  He's right, we did

9    do that.  But those awards did not conflict with

10   the law of any state.  They did not conflict

11   with what the Supreme Court set down in the

12   Alaska Packers case or in the MetLife case or

13   any other case, and that's the difference.

14             If there's a decision that says that

15   an employee waived a right to file under

16   Workers' Comp law in California, that would go

17   the same way as Alaska Packers; however, that's

18   not what happened in those two prior cases.

19   In those two prior cases, we had an

20   interpretation of the CBA, which we wanted to

21   have confirmed in the federal courts, and that's

22   what was done.

23             THE ARBITRATOR:  Is that it?

24             MR. BERTHELSEN:  And the other point

25   he made about Bruce Matthews is contending in

73

1    California that Tennessee law doesn't apply.  If

2    that's the case, it's because that's what

3    Tennessee law says, in effect, because Tennessee

4    law allows a Tennessee employer to file

5    elsewhere and proceed under the laws of that

6    state.

7              Now, if Tennessee only says that if

8    you want to come back here and file here, too,

9    then there's a credit for what you got in the

10   other state, and we'll educate you about that in

11   the brief.

12             THE ARBITRATOR:  Anything else?

13             MR. NASH:  I was wondering if we

14   could take a short break.  Would that be okay?

15             THE ARBITRATOR:  Sure.

16             (Recess.)

17        THE ARBITRATOR:  Let's go back on the

18   record.

19             Is there anything further to submit

20   from either of the parties?

21             MR. NASH:  The only thing I should

22   make clear, and we'll talk about this in the

23   brief.

24             As I said earlier, this is a -- we

25   believe this is a continuing breach of the

```
 1     agreement, and we are re -- want to reserve the
 2     right to -- we're seeking, obviously, a ruling
 3     that Mr. Matthews is in breach of his contract.
 4     And we also reserve the right to seek remedies
 5     for that breach, but they're not yet
 6     determinable because, for example, we've
 7     suffered damages as a result of the costs that
 8     we've incurred by his breach.
 9              And so I think we would ask that --
10     we will ask in our post-hearing brief for a
11     ruling about whether or not he's in breach.  We
12     believe that he is, and that you retain
13     continuing jurisdiction with regard to any
14     additional remedies that are appropriate as, you
15     know, things go on.
16              But right now, we don't have a way of
17     calculating that.
18              THE ARBITRATOR:  Mr. Berthelsen.
19              MR. BERTHELSEN:  We understand
20     Mr. Nash's position; however, we don't believe
21     he has any damages.  We don't believe there's
22     any breach here, so I guess we'll be thoroughly
23     briefing that point as well.
24              MR. NASH:  Sure.
25              MR. BERTHELSEN:  Every Tennessee
```

1   employer whose employee files in California has

2   the same issues.  That doesn't mean they can't

3   file.

4            THE ARBITRATOR:  Okay.  Then if

5   there's nothing further, the hearing will be in

6   adjournment, pending the receipt of the briefs.

7   And at that point, it will be officially closed.

8            I am grateful, as always, for the

9   excellent presentations of the lawyers involved.

10       (Proceedings concluded at 11:20 A.M.)

11                    -o0o-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3                I, KATHERINE GALE, Notary Public and

4     Court Reporter, do hereby certify that I

5     recorded to the best of my skill and ability, by

6     machine shorthand, all the proceedings in the

7     foregoing transcript and that said transcript is

8     a true, accurate, and complete transcript to the

9     best of my ability.

10               I further certify that I am not

11    attorney or counsel of any of the parties, nor

12    relative or employee of any attorney or counsel

13    connected with the action, nor financially

14    interested in the action.

15               SIGNED this 26th day of October,

16    2009.

17

18

19

20

21

      _____
22

         KATHERINE GALE
23       Notary Public
         State of Tennessee at large

24

25            My Commission expires:  02/27/2012